1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  KLAMATH-SISKIYOU WILDLANDS                No. 2:05-cv-0299-MCE-PAN
    CENTER, ENVIRONMENTAL
12  PROTECTION INFORMATION
    CENTER, and KLAMATH FOREST
13  ALLIANCE,

14              Plaintiffs,
        v.                                    MEMORANDUM AND ORDER
15

16  UNITED STATES FOREST SERVICE,

17              Defendant.

18                       ----oo0oo----

19       Through the present action, Plaintiffs Klamath-Siskiyou

20  Wildlands Center, Environmental Protection Information Center,

21  and Klamath Forest Alliance (hereinafter "Plaintiffs") seek to

22  prevent implementation of the so-called Meteor Project, as

23  proposed by Defendant United States Forest Service ("Forest

24  Service") for the North and South Forks of the Salmon River

25  Watershed near Yreka, California.

26  ///

27  ///

28  ///

                              1

Plaintiffs contend that the Final Environmental Impact Statement ("FEIS") issued by the Forest Service in August of 2004 for the project violates the provisions of the National Environmental Policy Act ("NEPA") by failing to adequately disclose and analyze its environmental consequences.  Both Plaintiffs and the Forest Service now move for summary judgment with respect to the adequacy of the FEIS, or alternatively for summary adjudication as to individual claims.[1]  In addition, the Forest Service has filed a Motion to Strike certain declarations offered by Plaintiffs, and Plaintiffs have moved to supplement the administrative record before the Court in presenting another declaration.  All motions will be addressed below.

**FACTUAL BACKGROUND**

According to the Forest Service's August 2004 FEIS, the Meteor Project is needed to "maintain stand health by leading [timber] stands into a resilient condition where they can provide a sustained yield of wood products, reduce the risk of these stands to catastrophic fire, maintain unique wildlife habitats, provide an economical, safe and environmentally sensitive transportation system."  AR 219-20.[2]

---

[1]While the Forest Service's Motion is technically denominated as being for summary judgment, only, at the oral argument on this matter the parties stipulated to the propriety of summary adjudication for both sides on the issues presented herein.

[2]Unless otherwise indicated, all citations to the administrative record lodged with the Court will be specified as
(continued...)

2

The Forest Service maintains that it designed the project to address adverse forest conditions that have resulted from a combination of overstocking, long-term drought, insects, and diseases.  AR 221, 1865-66.  In order to achieve this objective, the FEIS addressed some seventeen different treatment options, including a no-action alternative, before adopting Alternative 2, a program which incorporates a variety of logging methods ranging from regeneration harvest and group selection of old-growth trees, to thinning of smaller trees.  AR 230.  The selected alternative proposes logging of approximately six million board feet of timber (along with associated other activities such as planting, fuel treatment measures and gopher damage control) on 744 acres in 39 different units of the Klamath National Forest, scattered through a 316,000 acre area comprised of the North Fork Salmon River Watershed, the Lower South Fork Salmon River Watershed, and the Upper South Fork Salmon River Watershed.  AR 215, 245.  Timber harvest would take place by helicopter, cable, and tractor systems.  AR 230.

     The Forest Service released a Draft EIS for public comment on November 21, 2003.  Plaintiffs, along with other concerned groups and individuals, thereafter submitted comments.  Those comments were considered and responded to by the Forest Service in its final version of the EIS issued in August of 2004.  AR 385-441.

///

_____

     [2](...continued)
"AR".

3

The Final EIS analyzed three alternatives in detail, including a no action alternative and two other proposed measures for implementing the stated objectives of the Meteor Project. Alternative 3 differed from the selected option (Alternative 2) in several ways, including a different number of acres proposed for timber harvest and distinctions in terms of fuel and habitat treatment.  Fourteen other action alternatives were also considered, but not analyzed in detail.

On August 30, 2004, the Forest Service issued its Record of Decision for the Meteor Project (AR 470), and on October 15, 2004, Plaintiffs filed an appeal.  That appeal was ultimately rejected, with the Forest Service Appeal Reviewing Officer affirming the Forest Service's approval for the project on December 1, 2004.  AR 43-59.  This lawsuit ensued.

Plaintiffs take issue with the propriety of the FEIS, alleging that its disclosures fail to satisfy the procedural mandates of NEPA in several key respects.  Plaintiffs contend 1) that many large diameter trees are in fact marked for logging, instead of being protected as the FEIS would appear to suggest; 2) that discussion within the FEIS of geology issues and landslide potential outside the Jones Gulch watershed is not adequately addressed; 3) that natural background levels of turbidity must necessarily be disclosed by the FEIS, but are not; 4) that snag retention levels as contemplated by the FEIS are not sufficient to protect cavity excavator bird species; and 5) that the FEIS does not demonstrate how Green Tree Retention levels exceed 15 percent of the harvest unit, as required by the Northwest Forest Plan ("NFP").

1    In addition to these disclosure issues, Plaintiffs also
2  allege that the FEIS on a substantive basis does not properly
3  analyze the potential environmental effects of gopher baiting
4  with strychnine poisoning in the Meteor FEIS, and instead
5  improperly "tiers" or references non site-specific analyses in
6  environmental assessments prepared for other areas.

7    Finally, Plaintiffs contend that the FEIS further runs afoul
8  of NEPA in failing to consider a reasonable range of alternative
9  actions, with only two nearly identical proposals being
10 addressed.

11   Based upon these alleged deficiencies, Plaintiffs assert
12 that the Forest Service's decision to implement the Meteor
13 Project must be overturned as arbitrary and capricious.  The
14 Forest Service, on the other hand, contends that the FEIS
15 thoroughly analyzed the issues as well as feasible treatment
16 alternatives.

17

18                      **PROCEDURAL FRAMEWORK**

19

20   Congress enacted NEPA in 1969 to protect the environment by
21 requiring certain procedural safeguards before an agency takes
22 action affecting the environment.  The NEPA process is designed
23 to "ensure that the agency ... will have detailed information
24 concerning significant environmental impacts; it also guarantees
25 that the relevant information will be made available to the
26 larger [public] audience."  Blue Mountains Biodiversity Project
27 v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of
28 NEPA is to "ensure a process, not to ensure any result."  Id.

"NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after is it too late to correct." Center for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003). Complete analysis under NEPA also assures that the public has sufficient information to challenge the agency's decision. Robertson v. Methow Valley Citizens, 490 U.S. 332, 349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1998).

NEPA requires that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications, and alternatives, to all "major Federal Actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement, when required. Kleppe v. Sierra Club, 427 U.S. 390, 410, n.21 (1976). If an EIS adequately discloses such effects, NEPA's goal is satisfied. Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996) (emphasis in original).

NEPA does not mandate that an EIS be based on a particular scientific methodology, nor does it require a reviewing court to weigh conflicting scientific data. Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).

///

///

An agency must be permitted discretion in relying on the
reasonable opinions of its own qualified experts, even if the
court might find contrary views more persuasive. See, e.g.,
Kleppe, 427 U.S. at 420, n. 21.  NEPA does not allow an agency to
rely on the conclusions and opinions of its staff, however,
without providing both supporting analysis and data.  Idaho
Sporting Cong., 137 F.3d at 1150. Credible scientific evidence
that contraindicates a proposed action must be evaluated and
disclosed.  40 C.F.R. § 1502.9(b).

Because NEPA contains no provisions allowing a private right
of action (see Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882
(1990)), a party can obtain judicial review of alleged violations
of NEPA only under the waiver of sovereign immunity contained
within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-
706.

Under the APA, the court must determine whether, based on a
review of the agency's administrative record, agency action was
"arbitrary and capricious," outside the scope of the agency's
statutory authority, or otherwise not in accordance with the law.
Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356
(9th Cir. 1994).  Review under the APA is "searching and
careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court
may not substitute its own judgment for that of the agency.  Id.
(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401
U.S. 402 (1971), overruled on other grounds by Califano v.
Sanders, 430 U.S. 99 (1977)).

In reviewing an agency's actions, the standard to be
employed is decidedly deferential to the agency's expertise.

1  Salmon River, 32 F.3d at 1356.  Although the scope of review for

2  agency action is accordingly limited, such action is not

3  unimpeachable.  The reviewing court must determine whether there

4  is a rational connection between the facts and resulting judgment

5  so as to support the agency's determination.  Baltimore Gas and

6  Elec. v. NRDC, 462 U.S. 87, 105-06 (1983), citing Bowman Trans.

7  Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285-86

8  (1974).  In short, the court must ensure that the agency has

9  taken a "hard look" at the environmental consequences of its

10  proposed action.  Or. Natural Res. Council v. Lowe, 109 F.3d 521,

11  526 (9th Cir. 1997).

12

13  **Augmentation of the Administrative Record**

14

15  The Forest Service has moved to strike certain evidence

16  offered by Plaintiffs in conjunction with the summary judgment

17  motions presently before the Court.  Specifically, the Forest

18  Service asserts that certain portions of the Declarations of

19  Kimberly Baker and George Sexton must be disregarded on grounds

20  that the assertions contained therein were not part of the

21  underlying administrative record.  In response, Plaintiffs have

22  not only argued that inclusion of the above materials is

23  appropriate, but they have also moved to supplement the record to

24  include an additional declaration obtained from John R. ("Jack")

25  West.

26  ///

27  ///

28  ///

The Forest Service correctly points out that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996). The rationale for this general rule is that the reviewing court should determine agency compliance with the law solely on the record before the agency at the time of its decision. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 419. Limiting review in that regard precludes the reviewing court from conducting a de novo trial and substituting its opinion for that of the agency. See id. at 416.

Supplementation of an administrative record may nonetheless be justified where (1) the record needs to be supplemented to explain agency action; (2) the agency has relied upon documents or materials not included in the record; (3) supplementation is necessary to explain or clarify technical matters involved in the agency action; and (4) there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision-makers. Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d at 1450; Animal Def. Council v. Hodel, 840 F.2d 1432, 1436-37 (9th Cir. 1988). Augmentation is appropriate if any of the above criteria are satisfied. Id.

///
///
///
///
///

9

1      In addition to establishing certain foundational

2  requirements that are not disputed, the Baker and Sexton

3  Declarations contain explanatory statements regarding visits to

4  the timber sale areas and photographs taken during those visits,

5  many of which were already included in the existing

6  administrative record in any event.  The declarations pertain to

7  Plaintiffs' claim that significant environmental impacts were

8  ignored in the Forest Service FEIS, and that consequently the

9  provisions of NEPA were violated.  In addition, the West

10  declaration further illuminates the scientific concept of water

11  turbidity, a key issue in this case.

12      In cases challenging the adequacy of agency review under

13  NEPA, the Ninth Circuit has routinely admitted extra-record

14  evidence to show that the agency failed to consider all relevant

15  factors in assessing potential environmental effects.  See, e.g.,

16  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 n. 22

17  (9th Cir. 1992); City of Davis v. Coleman, 521 F.2d 661, 675 (9th

18  Cir. 1975); Natural Res. Def. Council v. Duvall, 777 F. Supp.

19  1533, 1534 n.l (E.D. Cal. 1991).  In Environment Now! v. Espy,

20  877 F. Supp. 1397, 1404 (E.D. Cal. 1994), this district permitted

21  expert declarations in order to highlight perceived deficiencies

22  in the environmental review process and to explain and assist

23  understanding the complex and technical subject matter underlying

24  the agency decision at issue.  This liberality in allowing

25  consideration of material beyond the record makes sense given the

26  fact that NEPA requires the court to make a "substantial inquiry"

27  into the nature of a federal agency's NEPA compliance.

28  ///

See <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 US. 402, 415 (1971).  As the Ninth Circuit pointed out in <u>Asarco Inc. v. U.S. Envtl. Prot. Agency</u>, 616 F.2d 1153, 1160 (9th Cir. 1980), "it will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."

Given these considerations, and because the materials at issue herein all relate to NEPA claims, they will be considered herein.  Consequently, the Forest Service's Motion to Strike is denied and Plaintiffs' request to augment the record is granted.

**ANALYSIS**

**A.  Large Diameter Trees Marked for Logging**

The Meteor Project's stated objective is to achieve forest resilience by, <u>inter alia</u>, reducing the risk of catastrophic fire and maintaining unique wildlife habitats.  AR 219-20.  The logging methods incorporated within the selected Alternative 2 purport to "increase the vigor and large tree character of the forest canopy."  AR 319.  Thinning is designed to concentrate growth on the "larger and more vigorous trees" in any given timber stand.  AR 251.  All dominant and co-dominant trees are proposed to be retained unless they are sick or dying.  AR 301.

///

///

11

1  Consequently the FEIS suggests that bigger trees will be
2  protected, and that generally only smaller trees will be
3  earmarked for removal.

4      Plaintiffs argue that the facts belie this contention.  In
5  many units most of the larger trees are marked for logging,
6  whereas the smaller diameter trees are not so designated.  AR 86-
7  88, 385-395.  Photographs attached to the Declaration of George
8  Sexton appear to show the largest, most fire-resistant overstory
9  trees marked for logging – a practice seemingly at odds with the
10 stated objective of the Meteor Project.  Sexton Decl., ¶¶ 13-19.
11 Plaintiffs contend that because the FEIS does not disclose the
12 effects of logging larger-diameter trees, it runs afoul of NEPA's
13 requirement that all relevant information concerning significant
14 environmental impacts be disclosed.  Robertson, 490 U.S. at 349.

15     In response, the Forest Service focuses on the fact that the
16 FEIS does contemplate removal of diseased trees.  The Forest
17 Service goes on to argue that even if some large trees are marked
18 for harvest that does not mean that "tree markings are
19 inconsistent with the silvicultural prescriptions described in
20 the Final EIS."  (Defs.' MSJ, 15:17-19).  The Forest Service also
21 speculates that some of the larger trees identified by Plaintiffs
22 may in fact have been diseased.  Otherwise, the Forest Service
23 offers no substantive rationale for what appears to be the
24 intended logging of bigger trees in contravention of the EIS.
25 The Forest Service has therefore failed to adequately rebut
26 Plaintiffs' contention that it is approaching logging on the
27 ground differently than the FEIS would appear to dictate.
28 ///

12

The FEIS does not adequately disclose the apparent extent to which old growth trees are subject to logging, and fails to adequately analyze the environmental effects of logging those trees.  The failure to disclose this important information is arbitrary and capricious and hence violates NEPA.  5 U.S.C. § 706(2)(A); Or. Envtl. Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987).  Plaintiffs are accordingly entitled to summary adjudication as to this issue.

**B.   Geology Issues/Landslide Potential**

Plaintiffs object to the Geology section of the Meteor FEIS (AR 267-71) on grounds that the section describes environmental effects only on the Jones Gulch watershed, which lies within only one of the fourteen seventh-field watersheds[3] encompassed by the project.  Erosion and slope failure occasioned by logging effects are the primary factors addressed from a geological perspective.

Plaintiffs' criticism of this portion of the FEIS is unfounded.  A comprehensive Geological Report (AR 1779-1832) was specifically prepared for the Meteor Project by a licensed geologist, Juan de la Fuente.  That report addresses landslide and sediment production issues.  The report concludes that the indirect effect of Alternative 2 implementation on landslide potential would be very small (AR 1780) and the FEIS specifically incorporates the Geology Report by reference.  AR 269.

///

[3]Seventh-field watersheds range between approximately 2,500 and 10,000 acres in size.

13

In addition, the geology section of the FEIS also incorporates modeling data for all fourteen seventh-field watersheds contained in the water quality section of the FEIS.  That data includes calculations based on the Mass Wasting Model, which predicts sediment volumes from landslide activity associated with a flood event occurring at an interval rate of ten to twenty years.  AR 277, 281.  Based on the Mass Wasting Model data, the FEIS concludes that the effects of the proposed activities are very small in relation to the impact of past events.  AR 271.

While Plaintiffs argue that disclosure (which incorporates by reference various portions of the 6,000 page administrative record) does not comport with the law because it is not sufficiently accessible to the public, the Court disagrees.  In this instance we have specific incorporation of not only a project-specific geology report, but also an on-point discussion of landslide potential in the very next portion of the EIS – a section literally separated by less than ten pages from the geology portion of the report.  The Forest Service is entitled to summary adjudication as to this issue.

**C.   Snag/Green Tree Retention Requirements**

The Meteor Project is subject to the provisions of the Northwest Forest Plan ("NFP").  The Record of Decision for certain amendments to the NFP requires that the Forest Service retain enough snags (standing dead trees) to support 40 percent of the potential population levels of cavity-nesting bird species such as woodpeckers.  AR 5642.

14

The same Record of Decision similarly requires that at least 15 percent of the area associated with each cutting unit be preserved as a "green tree retention" for bird habitat purposes. AR 5641.  Plaintiffs argue that the Meteor Project FEIS fails to demonstrate how it satisfies these criteria.  In fact, Plaintiffs point out that the logging prescriptions for several units falling within the project call for retention of only one or two large diameter trees per acre, and that treatment plans for other units include clear cuts of up to two and a half acres, where no trees will be retained.  According to Plaintiffs, the FEIS does not demonstrate that these allowances will adequately support 40 percent of potential cavity-nesting bird populations, as they must in order to pass muster under the NFP.  Plaintiffs contend that the decision to implement the Meteor Project in the absence of such analysis/determination violates NEPA as being arbitrary and capricious.  5 U.S.C. § 706(2)(A).

    In response, the Forest Service points out that the Meteor Project MIS Assessment provides that "moderate capability snag habitat" in timber harvest units can be maintained through the 15 percent retention of green trees and snags in patches, and through retention of an average of five large snags per acres across the project area landscape.  AR 1902-03.

///
///
///
///
///
///

1  While neither the FEIS itself or the MIS Assessment illuminate

2  how such "moderate capability snag habitat" relates to the

3  prescribed percentage of potential bird population mandated by

4  the NFP, the Forest Service points to the Klamath Land and

5  Resources Management Plan ("LRMP") indicates that moderate

6  capability habitat for snag-dependent species can support 60 to

7  80 percent of "optimum" population levels.  AR 5159.  The Forest

8  Service argues that because these figures exceed 40 percent, the

9  analysis in the Meteor FEIS is adequate for NEPA purposes.

10      The Court disagrees.  First, the concept of "optimum"

11  population levels described in the LRMP is not identical to the

12  "potential" population level mandated by the NFP, and the FEIS

13  does not explain how the terms differ.  Second, the Forest

14  Service cannot defer on a site-specific analysis simply by

15  referring to a broad programmatic document like the LRMP which

16  may be outdated or no longer scientifically substantiated.  In

17  any event, the requirements of NEPA are not satisfied by the

18  FEIS' discussion of snag retention in terms of cavity-nesting

19  bird habitat.  Consequently, Plaintiffs are entitled to summary

20  adjudication with respect to snag/green tree retention

21  requirements.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## D.  Turbidity

The Clean Water Act requires that each state implement water quality standards, and that federal agencies comply with those standards.  33 U.S.C. §§ 1313, 1323.  California law delegates to Regional Water Control Boards the responsibility for developing "Basin Plans" that establish appropriate water quality conditions and waste discharge requirements.  Cal. Water Code §§ 13241, 13263.  With respect to the area encompassed by the proposed Meteor Plan, the North Coast Regional Water Quality Control Board provides that "[t]urbidity shall not be increased more than 20 percent above naturally occurring background levels."  AR 5742.  Turbidity is defined as "the optical property of water as affected by suspension of material such as sediment."  AR 350.

Plaintiffs argue that because the FEIS fails to disclose the relevant background turbidity levels, it by definition violates NEPA because in the absence of that data it is impossible to tell whether the Meteor Project substantively complies with the applicable Basin Plan.  (Pls.' Reply in Support of Pls.' MSJ, 14:7-9).  The Forest Service admits that the FEIS did not disclose natural background turbidity levels, but claims that its adoption of Best Management Practices ("BMPs") made such disclosure unnecessary.  See Defs.' MSJ, 12:7-9; Defs.' Opp. to Pls.' MSJ, 2:9-12, 18-21.

The BMPs upon which the Forest Service relies consist of inference points developed on the basis of three different models that estimate sedimentation by considering various factors such as disturbance type and land sensitivity.  AR 2120-24.

17

Two of the models utilized in the FEIS, the Surface Erosion Model and the Mass Wasting Model, contain inference points identified as 800 and 200 percent, respectively, over estimated background turbidity levels.  AR 277, 2116.  Hence the Forest Service Models themselves gauge the applicable thresholds of concern, or inference point, against the background turbidity level.  Despite its concession that those background levels have not been disclosed by the FEIS, the Forest Service still maintains that the BMPs it utilizes have been found to be effective in maintaining water quality in conformance with the Basin Plan.  AR 351.  The effectiveness of BMPs in ensuring compliance has nonetheless not been absolute; effectiveness as determined by Forest Service random samples has ranged between the high 80s and 90s every year since 1993.  AR 351.

In Northwest Indian Cemetery Protective Association v. Peterson, 795 F.2d 688 (9th Cir. 1986), the Ninth Circuit was confronted with a Basin Plan similar to the instant plan which prohibited water turbidity from increasing more than twenty percent over background levels.  Also similar to this case was the government's argument in Indian Cemetery that measurement of background turbidity levels was superseded by Forest Service BMPs.  Significantly, the court found that "[a]dherence to the BMPs does not automatically ensure that applicable state standards are being met."

///

///

///

///

18

1    795 F.2d at 697.   Moreover, while Or. Natural Res. Council v.

2    Lynq, 882 F.2d 1417, 1424 (9th Cir. 1989), states that state-

3    approved BMPs may constitute compliance with the Clean Water Act

4    if monitoring does not reveal that violation of water quality

5    standards has nonetheless occurred even with implementation of

6    the pertinent BMPs, as stated above even the Forest Service

7    concedes in this instance that BMPs do not always assure

8    compliance.

9         The Forest Service has simply not shown that background

10   levels of turbidity are irrelevant and meaningless to a careful

11   evaluation of the Meteor Project under NEPA.   Background levels

12   are an essential component of both the Basin Plan's calculus and

13   an evaluation of the BMPs themselves, which similarly use as a

14   basis point the same natural levels of turbidity.   The failure to

15   disclose background turbidity levels was a violation of NEPA, and

16   Plaintiffs are entitled to summary adjudication on this issue.

17

18   **E.   Gopher Baiting**

19

20        The Meteor Project authorizes the application of strychnine-

21   treated grain to eradicate gophers.   AR 231, 462.   In analyzing

22   the potential environmental effects of such baiting, the FEIS

23   purports to "summarize" two other analyses of gopher baiting

24   undertaken in two different environmental assessments ("EAs").

25   AR 241, see Defs.' MSJ 20:2-3 ("[t]he FEIS summarized several

26   environmental assessments").

27   ///

28   ///

Both of the EAs considered gopher control activities "in conifer plantations", and while one considered such effects within the same Salmon River Ranger District where the Meteor Project is situated, the other was in a wholly different locale, the Scott River Ranger District.  AR 3989, 3499.  Neither EA was site-specific to the area contemplated for gopher eradication in the Meteor Project.

Plaintiffs contend that by relying solely on results from EAs, the Forest Service impermissibly "tiered" their assessment within the EIS in violation of NEPA.  NEPA regulations define "tiering" as "the coverage of general matters in broader environmental impact statements ... with subsequent narrower statements or environmental analyses."  40 C.F.R. § 1508.28.  Tiering is appropriate only when an analysis of greater scope is utilized to assess an analysis of lesser scope.  Id.  A site-specific document may consequently be tiered under certain circumstances to an earlier programmatic EIS, but not to a less rigorously scrutinized EA.  Or. Natural Desert Ass'n v. Green, 953 F. Supp. 1133, 1147 (D. Or. 1997).[4]

Plaintiffs contend that not only are the studies relied upon here are EAs, but also that the EAs at issue are distinguishable in any event because they dealt with gopher baiting activities in already regenerated conifer plantations rather than areas, like the Meteor Project, containing mature and old growth forests.

---

[4]The Forest Service concedes this point.  As stated in its initial points and authorities in support of summary judgment, "NEPA regulations permit an environmental assessment to tier to an EIS, but do not allow an EIS to tier to an environmental assessment."  Defs.' Mem. In Support of Summ. J., 19:22-24.

1   AR 250-52.  Because of this difference between the subject matter

2   of the EAs at issue, Plaintiffs argue that additional site-

3   specific analysis for the Meteor Project was required, and that

4   its absence violates NEPA.

5        The Forest Service unconvincingly argues that because it did

6   not use the word "tier" in its discussion of the earlier EAs

7   which assessed gopher baiting, the proscription against tiering

8   should not apply since at most the Meteor FEIS merely

9   "summarized" the earlier EA results.  This is a distinction

10  without a difference given the fact that summarizing the EA

11  results in support of the Meteor FEIS amounts to exactly the same

12  thing as tiering.  Moreover, the EAs assessed gopher control

13  under different conditions.  The Forest Service does not dispute

14  the fact that the Granite Gopher Baiting EA and the Scott River

15  Gopher Control EA involved "conifer plantations" but contend that

16  conditions are still analogous because gopher baiting in the

17  Meteor Project would occur in "reforested" areas.

18       This still does not make the two situations comparable, let

19  alone permit "tiering" from the EAs to the Meteor Project FEIS.

20  Conifer plantations by definition entail areas reserved virtually

21  solely for producing wood products, whereas the Meteor Project

22  purports to be designed specifically to promote the thinning and

23  sustainability within the context of an established forest

24  framework including bigger trees and mature conditions.  The

25  Meteor Project cannot tier to the EAs in question both because of

26  the general proscription against such tiering and because the

27  subject matter of the EAs is different.

28  ///

21

1  Without site-specific analysis of gopher baiting, the Meteor FEIS

2  fails to meet NEPA standards.  Plaintiffs are entitled to summary

3  adjudication as to this issue as well.

4

5  **F.   Whether Reasonable Range of Alternatives Analyzed**

6

7      An FEIS must "rigorously explore and objectively evaluate

8  all reasonable alternatives" to an agency's proposed action, so

9  as to provide a "clear basis for choice among options by the

10 decisionmaker and the public."  40 C.F.R. § 1502.14(a).  Although

11 an EIS is inadequate if it fails to address viable but unexamined

12 alternatives (see Morongo Band of Mission Indians v. F.A.A., 161

13 F.3d 569, 575 (9th Cir. 1998)), only feasible alternatives,

14 rather than an infinite range of alternatives, need be considered

15 under the so-called "rule of reason" standard.  City of Carmel-

16 by-the-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1155 (9th

17 Cir. 1997).

18      In the present matter, Plaintiff assert that the two action

19 alternatives considered by the FEIS at length (Alternatives 2 and

20 3) were "nearly identical" and failed to provide enough

21 information for the public to make an informed decision about the

22 environmental effects of each alternative.  Plaintiffs argue that

23 for the most part the effects of the two action alternatives were

24 simply discussed together, and contend that in the absence of a

25 "reasonably full range of alternatives" such virtually identical

26 alternatives are insufficient to satisfy the prerequisites of

27 NEPA.  See Muckleshoot Indian Tribe v. U.S. Forest Serv., 177

28 F.3d 811, 813 (9th Cir. 1999).

1    Plaintiffs' argument in this regard is unfounded.

2  Alternatives 2 and 3 proposed different harvest and fuel

3  treatments on a different number of total acres (744 versus 650)

4  and harvest units (39 as opposed to 34).  AR 229-32.  Alternative

5  3 also entails different timber harvest prescriptions and would

6  not treat riparian reserves.  AR 254.  Consequently, while the

7  alternatives may share certain effects, they are nonetheless not

8  identical.

9    Significantly, Plaintiffs do not dispute the Forest

10  Service's contention that the remaining fourteen other

11  alternatives mentioned in the FEIS were either not conducive to

12  the Meteor Project's stated purposed and need, were not feasible,

13  or would have caused unnecessary environmental harm.  See AR 241-

14  243.  They simply argue that not enough information was provided

15  to distinguish between alternatives, or to weigh the relative

16  effects of each alternative.

17    In Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d

18  517 (9th Cir. 1994), the Ninth Circuit upheld an EIS that, like

19  the present case, discussed in detail a no-action alternative

20  along with two similar action alternatives.  The Laguna court

21  explained that the project EIS "discusse[d] in detail all the

22  alternatives that were feasible and briefly discusse[d] the

23  reasons others were eliminated" before concluding that "[t]his is

24  all that NEPA requires."  Id. at 524.

25    Laguna's reasoning is equally applicable here and the

26  alternatives examined within the Meteor Project FEIS withstand

27  scrutiny under NEPA.

28  ///

**G.   Exhaustion Issues**

     In addition to opposing Plaintiffs' challenges to the sufficiency of the Meteor Project FEIS on their merits, the Forest Service also contends that certain of the arguments posited by Plaintiffs are barred because Plaintiffs did not raise the issues in question during the administrative appeal process. The Forest Service asserts that Plaintiffs' claims regarding 1) snag/tree retention requirements and 2) improper tiering of gopher baiting analysis have not adequately been exhausted.

     To challenge an administrative decision such as agency approval of an FEIS, a plaintiff must first exhaust all available administrative remedies required by statute.   Darby v. Cisneros, 509 U.S. 137, 146-47 (1993).   Statutes and regulations governing the Forest Service impose an exhaustion requirement on Plaintiffs herein in challenging the Meteor Project.   See Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965-66 (9th Cir. 2002); Native Ecosystems Council v. Dombeck, 304 F.3d 886, 898-99 (9th Cir. 2002).   If Plaintiffs failed to raise issues during the administrative process, they forfeit any objection to an EIS on the basis of those issues.   Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004).   The Forest Service must have been afforded the opportunity to give any issue raised by Plaintiffs "meaningful consideration" during the administrative process. Id.

     Review of the administrative record does not support the Forest Service's contention that issues now litigated by Plaintiffs are absent from the underlying administrative record.

Comments provided by Plaintiff Klamath Forest Alliance address the failure of the EIS to discuss snag recruitment (AR 883) and to properly address environmental effects occasioned by gopher baiting (AR 888).  Plaintiff Klamath-Siskiyou Wildlands Center also raised the issue of gopher baiting in its commentary.  (AR 907 (challenging dangerous nature of practice); 896 (improper tiering).  Moreover, the Forest Service's own Response to Comments on the draft EIS also confronts these issues.  (AR 389, 399, 401, 429 (tree/snag retention); AR 392, 430 (gopher baiting).

All issues raised by Plaintiffs are therefore properly before the Court.

**CONCLUSION**

Based on the foregoing, summary judgment is DENIED with respect to both Motions presently before the Court.  Summary adjudication is partially GRANTED, however, in favor of both Plaintiffs and the Forest Service.  Plaintiffs are entitled to summary adjudication as to the following issues: 1) that the FEIS fails to adequately analyze the field designation of significant numbers of larger trees for logging; 2) that snag/green tree retention requirements do not adequately address cavity-nesting bird habitat; 3) that background turbidity levels are not disclosed, as they must, in the FEIS; 4) that in the absence of a site-specific analysis of gopher baiting, the FEIS fails to meet NEPA standards; and 5) that all issues before the Court are adequately exhausted.

1 On the other hand, the Forest Service prevails with respect to 1)

2 issues pertaining to geology and landslide potential; and 2)

3 consideration of reasonable project alternatives.

4     In addition, the Forest Service's Motion to Strike is DENIED

5 and Plaintiffs' request to supplement the administrative record

6 with the Declaration of John R. West is GRANTED.

7     While declaratory relief is granted to both parties in

8 accordance with the above, the Court has determined that further

9 proceedings are needed before determining the proper scope of any

10 injunctive remedy in light of the present rulings.  A further

11 hearing on that issue is scheduled for September 11, 2006 at 9:00

12 a.m.  Briefing shall be conducted in accordance with Local Rule

13 78-230.

14

15     IT IS SO ORDERED.

16

17 DATED: July 13, 2006

18

19

20 _____

21 MORRISON C. ENGLAND, JR
   UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28